# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GULET MOHAMED,                      )
                                    )
                Plaintiff,          )
        v.                          )       No. 1:11-cv-50 (AJT/TRJ)
                                    )
ERIC H. HOLDER, JR., *et al.*,      )
                                    )
                Defendants.         )
_____    )

## MEMORANDUM OPINION

Plaintiff Gulet Mohamed has filed a three-count Third Amended Complaint based on his

alleged placement on the No Fly List compiled by Defendant Terrorist Screening Center (the

"TSC"). In Count I, Mohamed alleges that his constitutional right of reentry into the United

States has been, and continues to be, infringed by his placement on the No Fly List. In Count II,

Mohamed appeals, under the Administrative Procedure Act ("APA"), the TSC's decision to

place him on the No Fly List, contending that the TSC's decision was arbitrary and capricious

and contrary to law. In Count III, Mohamed alleges that he has been denied procedural due

process in connection with his placement on the No Fly List. This matter is before the Court on

Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint [Doc. No. 58]. For the

reasons set forth below, the Court concludes that, as applied to American citizens, the No Fly

List raises substantial constitutional issues, and that the plaintiff has alleged facts sufficient to

make plausible certain of his constitutional claims. The Motion will therefore be GRANTED in

part and DENIED in part.

# I. BACKGROUND

## A. Procedural History

On January 18, 2011, Mohamed filed this action against Eric H. Holder, Jr., in his official capacity as Attorney General of the United States, Robert S. Mueller, III, in his official capacity as Director of the Federal Bureau of Investigation ("FBI"), and Timothy J. Healy, in his official capacity as Director of the TSC (collectively, the "Official Capacity Defendants"). Mohamed claims the Official Capacity Defendants violated his constitutional rights by placing him on the "No Fly List," the federal government's list of individuals on its terrorist watchlist who are prohibited from boarding commercial flights originating from or bound for destinations within the United States, and by preventing him from returning from Kuwait to the United States. Accompanying Mohamed's complaint was an application for emergency relief with respect to his alleged inability to return to the United States from Kuwait because of his placement on the No Fly List. After an initial hearing held on January 18, 2011, Mohamed's application for emergency relief became moot when he was permitted to return to the United States on January 21, 2011.

On May 20, 2011, Mohamed amended his complaint to add as defendants in their individual capacities "Unknown Agents," who he alleged tortured him in Kuwait, and "Unknown TSC Agents," who he alleged placed him on the No Fly List while he was abroad. In response, the defendants filed a motion to dismiss [Doc. No. 22], which the Court granted in part and denied in part on August 26, 2011 [Doc. Nos. 31-32]. In that Order, the Court dismissed those of Mohamed's claims against the Official Capacity Defendants that were based solely on his alleged inclusion in the Terrorist Screening Database ("TSDB") and on the No Fly List and transferred his remaining claims against the Official Capacity Defendants, as well as his claims

2

against the Unknown TSC agents, to the Court of Appeals for the Fourth Circuit pursuant to 49

U.S.C. § 46110, which gives the Courts of Appeals exclusive jurisdiction over challenges to

certain orders of the Transportation Security Administration ("TSA").[1]  This Court retained

jurisdiction over the remaining claims against the Unknown Agent Defendants.  However,

Mohamed failed to timely identify, join and serve those defendants and, on March 2, 2012, the

Court dismissed the case as to those defendants pursuant to Fed. R. Civ. P. 4(m).

On May 28, 2013, the Court of Appeals entered an order vacating that portion of this

Court's Order dated August 26, 2011 that transferred certain claims to it and remanding the case

to this Court for further proceedings, having concluded that it lacked exclusive jurisdiction over

Mohamed's claims pursuant to 49 U.S.C. § 46110.  On August 29, 2013, Mohamed filed his

Third Amended Complaint, which the defendants moved to dismiss on September 27, 2013.  The

Court held a hearing on the Motion to Dismiss on November 15, 2013, at which time it took the

matter under advisement.

---

[1] 49 U.S.C. § 46110 provides in pertinent part:
  (a) . . . [A] person disclosing a substantial interest in an order issued by the Secretary of
  Transportation . . .  may apply for review of the order by filing a petition for review in the
  United States Court of Appeals for the District of Columbia Circuit or in the court of
  appeals of the United States for the circuit in which the person resides or has its principal
  place of business . . . .
  (b) . . . When a petition is filed under subsection (a) of this section, the clerk of the court
  immediately shall send a copy of the petition to the Secretary, Under Secretary, or
  Administrator, as appropriate . . . .
  (c) . . . When the petition is sent to the Secretary, Under Secretary, or Administrator, the
  court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the
  order and may order the Secretary, Under Secretary, or Administrator to conduct further
  proceedings.

**B. Factual Allegations[2]**

Briefly summarized, Mohamed alleges the following facts:

Mohamed, age 21, is a United States citizen and a resident of Alexandria, Virginia.  Third Amend. Compl. ¶ 7.  In March 2009, he "temporarily left the United States to learn Arabic and connect with members of his family living abroad."  *Id.* ¶ 37.  Mohamed first studied Arabic for a few weeks in Yemen, but left "out of concern for his safety given the instability of the country" and traveled to Somalia, where he stayed with relatives for several months.  *Id.*  Around August 2009, Mohamed moved to Kuwait to continue his Arabic studies and stayed with an uncle.  *Id.* Mohamed entered each country lawfully and maintained his lawful status during his travels abroad.  *Id.*

On December 20, 2010, after having twice renewed his Kuwaiti visitor's visa without incident, Mohamed went to again renew his visa at an airport in Kuwait.  *Id.* ¶ 39.  While he was at the airport, "two men in civilian clothes approached Mr. Mohamed, handcuffed him, blindfolded him, escorted him to a waiting SUV, and drove him to an undisclosed location approximately fifteen minutes from the airport."  *Id.* ¶ 40.  Mohamed was held at that location for more than a week and "was repeatedly beaten and tortured by his interrogators," one of whom spoke "perfect American English."  *Id.* ¶¶ 40-42.[3]

---

[2] The statements in this section are based on the allegations of the Third Amended Complaint, the declarations filed by the defendants with respect to the No Fly List and related programs, and those facts that currently appear undisputed based on the briefing pertaining to the Motion to Dismiss.  The Court provides this statement of relevant facts solely for the purpose of ruling on the Motion to Dismiss.  The Court also incorporates by reference its Memorandum Opinion dated August 26, 2011 [Doc. No. 31], which describes in detail the factual background of this case as well as the challenged government programs and procedures.

[3] Mohamed alleges the following details concerning his treatment while in detention:

4

On December 28, 2010, Mohamed's interrogators transferred him to a deportation facility, from which he was able to make contact with his family in the United States and retain a lawyer in the United States. *Id.* ¶¶ 44-45. Kuwaiti officials told Mohamed's family that he was being held at the behest of the United States government. *Id.* ¶ 46. Further, the Kuwaiti officials attempted to deport Mohamed but were unable to do so because the United States had placed him on the No Fly List. *Id.* While at the deportation facility, Mohamed received two visits from FBI agents, on December 28, 2010 and January 12, 2011. *Id.* ¶¶ 47-48. During those visits, the FBI agents told him that "they could expeditiously procure his release from detention if Mr. Mohamed spoke to them," and that "he would remain in detention indefinitely if he did not speak to them." *Id.* ¶ 47. The agents questioned Mohamed for hours, even after he repeatedly asked them to stop, and they threatened future interrogations and criminal charges. *Id.* ¶ 48. On January 16, 2011, Mohamed's family purchased a ticket for him to return to the United States at the suggestion of Kuwaiti officials, who delivered the ticket to Mohamed and transported him to the airport, where he was denied boarding.[4] *Id.* ¶ 49.

On January 18, 2011, Mohamed, through his American lawyer, filed this action, together with a request for emergency relief to obtain Mohamed's return to the United States. The Court

---

Mr. Mohamed's interrogators struck him in the face with their hands regularly and in Mr. Mohamed's estimate more than a hundred times. The interrogators whipped his feet and other parts of his body with sticks. Mr. Mohamed was forced by his interrogators to stand for prolonged periods of time. At one point, the interrogators threatened to run currents of electricity through Mr. Mohamed's genitals. In another instance, Mr. Mohamed's arms were tied to a ceiling beam and left in that position until he lost consciousness . . . . Mr. Mohamed remained blindfolded and handcuffed most of the time.

Third Amend. Compl. ¶¶ 40-41.

[4] Based on the other facts alleged, the Third Amended Complaint's listing of the date as January 16, 2010 is clearly an error.

held a hearing on the emergency request that same day but continued the hearing to January 20, 2011 at the defendants' request and based on their representations concerning their efforts to place Mohamed on a flight back to the United States. On January 20, 2011, the defendants advised the Court that arrangements had been made for Mohamed to return to the United States that day, and on January 21, 2011, Mohamed arrived in the United States by commercial airliner without escort or restraints and without incident. *See id.* ¶ 50. Since his arrival in the United States, Mohamed has not been criminally charged or otherwise detained.

Mohamed alleges that the FBI "does not limit its nominations [for inclusion on its terrorist watchlist] to persons it believes pose a threat to commercial aircraft . . . [but] also nominates individuals it considers as a broader threat to domestic or international security." *Id.* ¶ 22. Further, Mohamed alleges that "Defendants placed Mr. Mohamed on its No Fly List while he was abroad in order to pressure him to forgo his right to counsel, submit to invasive questioning, and become an informant for the FBI upon returning to the United States." *Id.* ¶ 2. Finally, Mohamed alleges that this improper use of the No Fly List extends beyond his own experience and that the FBI has repeatedly used the No Fly List "not just to protect commercial aircraft, but rather to coerce a specific subset of Americans—Muslim citizens—to forgo their rights, obstruct their ability to move freely, and otherwise give Defendants' agents leverage over listed persons." *Id.* ¶ 3.

Mohamed claims that his placement on the No Fly List constitutes: (1) a violation of his right as a U.S. citizen to reside in the United States and reenter it from abroad (Count I); (2) unlawful agency action that violates his Fourteenth Amendment right to return to the United States and his Fifth Amendment liberty interests "in traveling by air and being free from false governmental stigmatization as a terrorist" (Count II); and (3) a violation of his right to

6

procedural due process, including his right to pre- or post-deprivation notice and a hearing (Count III).

## C.  The Terrorist Screening Center and Terrorist Screening Database

Following the attacks of September 11, 2001, Congress and the President mandated that federal executive departments and agencies share terrorism information with those in the counterterrorism community responsible for national security.  Piehota Decl., ¶ 4.[5]  Specifically, Congress directed that the TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers (A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and (B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual."  49 U.S.C. § 114(h)(3).

On September 16, 2003, through Homeland Security Presidential Directive ("HSPD")-6, President Bush sought to consolidate the government's approach to terrorist prevention activities. Toward that end, the Attorney General, pursuant to HSPD-6, established the TSC as a multi-

---

[5] In support of their Motion to Dismiss, the defendants have submitted the declarations of Mark Giuliano, Laura Lynch, and Christopher Piehota, which speak to the specific programs, agencies and other matters referenced and alleged in the Third Amended Complaint.  The Court has considered these declarations in connection with the defendants' jurisdictional challenges based on lack of standing, ripeness and exhaustion of remedies as well as their motion to dismiss the Third Amended Complaint on the grounds that it fails to state claims as a matter of law.  *See Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (matters outside the pleadings may be considered in connection with jurisdictional challenges); *see also Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (on a motion to dismiss, the court may consider documents referenced by the complaint and matters of which it may take judicial notice).

agency center for coordinating information pertaining to terrorist activity.[6]  *Id.* ¶ 2.  HSPD-6 also directed the creation of the Terrorist Screening Database ("TSDB") as the government's consolidated terrorist watchlist maintained by the TSC.  *Id.* ¶ 6.  In creating the TSDB, the government consolidated as many as twelve preexisting watchlists, including the No Fly List. *Id.* ¶¶ 5-6.[7]

The TSC determines whether to place individuals in the TSDB based on "nominations" received from the National Counterterrorism Center ("NCTC") and the FBI.  *Id.* ¶¶ 8-10.  The TSC places a nominated individual in the TSDB if the nomination is supported by "minimum substantive derogatory criteria."  *Id.* ¶ 10.  Whether an individual satisfies the substantive derogatory criteria necessary to be placed in the TSDB is "generally based on whether there is reasonable suspicion to believe that a person is a known or suspected terrorist."  *Id.* ¶ 12.  In order to meet this standard, "the nominator, based on the totality of the circumstances, must rely upon 'articulable' intelligence or information which, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is a known or suspected terrorist."[8] *Id.*  By contrast, "[m]ere guesses or 'hunches,' or the reporting of suspicious activity alone are not enough to constitute a reasonable suspicion and are not sufficient bases to watchlist an

---

[6] The TSC receives support from, *inter alia,* the Department of Justice, the Department of Homeland Security, the Department of State, and the Office of the Director of National Intelligence, and is staffed by officials from those agencies and also the FBI, the TSA, and U.S. Customs and Border Protection.  Piehota Decl., ¶ 2.

[7] The No Fly List was originally maintained by the TSA, which was formerly within the Department of Transportation and is now part of Department of Homeland Security.  Piehota Decl., ¶ 5.

[8] The TSDB itself does not contain any "derogatory intelligence information" but is limited to "sensitive but unclassified terrorist identity information consisting of biographic identifying information such as name or date of birth or biometric information such as photographs, iris scans, and fingerprints."  Piehota Decl., ¶ 6.

8

individual." *Id.* Likewise, "nominations must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." *Id.* "TSC personnel" make the decision of whether to place an individual in the TSDB, and "TSA employees assigned to and stationed at the TSC serve as subject matter experts regarding those individuals nominated to the No Fly and Selectee Lists." *Id.* ¶¶ 11-13.

The No Fly List is a subset of individuals included in the TSDB and is defined by the Department of Homeland Security ("DHS") as "a list of individuals who are prohibited from boarding an aircraft." *Id.* ¶ 16. The Selectee List, another subset of the TSDB, is "a list of individuals who must undergo additional security screening before being permitted to board an aircraft." *Id.* In order for the TSC to place an individual on the No Fly or Selectee List, his nomination must meet unspecified "additional derogatory requirements" in addition to the "minimum substantive derogatory criteria" required for placement in the TSDB. *Id.* ¶ 10.

Through its Secure Flight Program, the TSA receives information on passengers from airlines and compares it to information contained in government watchlists, including the No Fly and Selectee Lists. Lynch Decl., n.1. An airline cannot issue a boarding pass until it receives permission from the TSA. In addition, "[t]he TSC, through the TSDB, makes terrorist identity information accessible to various screening agencies and law enforcement entities by the regular export of updated subsets of TSBD data. For example, the No Fly and Selectee Lists are available for passenger and employee screening." Piehota Decl., ¶ 15.

The TSC and the other agencies involved operate under a directive to maintain "thorough, accurate, and current information within the TSDB." *Id.* ¶ 19. To meet that directive, "several quality control measures are continuously applied by nominating agencies, the TSC, and NCTC," including "periodic reviews and audits to guarantee the integrity of the information

9

relied upon for the maintenance of TSDB records, and an ongoing responsibility upon the nominating agencies to notify NCTC and TSC of any changes that could affect the validity or reliability of that information." *Id.* That review process does not include any disclosure to the individual involved or any judicial oversight or review before a person is included in the TSDB or placed on the No Fly List.

Congress has mandated that DHS "shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security." 49 U.S. § 44926(a). DHS is also required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S. 44903(j)(2)(C)(iii).

In response to these congressional mandates, the TSA has established a procedure called DHS Traveler Redress Inquiry Program ("DHS TRIP"), through which the government provides redress to travelers who have been referred for additional screening or delayed or denied airline boarding for any reason, including because of their alleged placement on the No Fly List. Piehota Decl., ¶ 26. To initiate the review process, the traveler must first submit a traveler inquiry form to DHS. Lynch Decl., ¶ 5. When a traveler's inquiry seems related to the TSDB, it is referred to the TSC, which determines whether the traveler is an exact match to an individual listed in the TSDB. Piehota Decl., ¶ 29. If there is a match, the TSC works in collaboration with the agency that nominated the individual to determine whether the individual's current status is

appropriate. *Id.* ¶¶ 29-31. After its review, the TSC notifies the TSA, which sends a determination letter to the traveler. Lynch Decl., ¶ 10. The determination letter does not reveal whether the individual is, or ever was, on the No Fly List, or the reasons for his status. Piehota Decl., ¶ 32. The DHS TRIP letter advises, however, that the inquiring traveler can seek judicial review of the TSA's actions in the United States Court of Appeals pursuant to 49 U.S.C. § 46110 and may also indicate that the traveler can pursue an administrative appeal with the TSA. Lynch Decl., ¶ 11.

## II. ANALYSIS

### A. Interests Implicated by the No Fly List, as Applied to American Citizens

It is among the most compelling of governmental duties to protect our country from its enemies, foreign and domestic. Today, we are at war with those who would, if possible, use a commercial aircraft as an instrument of mass murder. There can be no doubt that the government has the right and obligation to identify, investigate and stop those who present such a threat; and for that purpose, the government must collect and act on intelligence information concerning possible terrorists, while protecting its sources and methods. It is a task of the highest national priority, performed by dedicated Americans whose mission is to protect this country and its citizens. It is because the stakes are so high and the consequences of a lapse in security so potentially catastrophic that the central issue presented in this case—how to adequately protect our population from terrorist threats while remaining faithful to the basic liberties that define the society we seek to preserve—is so difficult. For this reason, the constitutional issues pertaining to the No Fly List cannot be responsibly addressed without an informed, fact-based record that allows an assessment of the unavoidable trade-off between

11

security and personal liberties and whether the No Fly List, and its associated procedures and uses, strikes the appropriate balance between the two.

At first blush, it may seem a small intrusion upon the fabric of our freedoms to eliminate the ability of a relatively small number of American citizens to fly on commercial airlines in order to avert a possible catastrophic air disaster, such as occurred over Lockerby, Scotland in 1988, or nearly occurred through the efforts of the "Shoe Bomber" in 2001[9] or the "Christmas Day bomber" in 2009,[10] particularly if there is a process in place dedicated to limiting that restriction to those reasonably suspected to be terrorists. *See* Piehota Decl., ¶ 12. We were recently reminded by the Boston Marathon bombings that there are, indeed, those living among us who seek to indiscriminately kill on American soil. And the No Fly List is designed to protect a particularly vulnerable population—those who fly on commercial airlines. *See, e.g., United States v. Hartwell*, 436 F.3d 174, 179 (3d Cir. 2006) ("[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance."). Extended analysis is not required, however, to understand that the No Fly List implicates some of our basic freedoms and liberties as well as the question of whether we will embrace those basic freedoms when it is most difficult.

The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and

---

[9] On December 22, 2001, Richard Reid, the "Shoe Bomber," attempted to detonate explosives hidden in his shoes during a flight from Paris to Miami. He was sentenced to life in prison.

[10] On December 25, 2009, Umar Farouk Abdulmutallab, the "Christmas Day bomber," attempted to detonate, in flight, explosives concealed in his underwear. He was convicted of, among other charges, attempted murder and conspiracy to commit an act of terrorism transcending national boundaries, and was sentenced to life in prison. Mohamed alleges that following this event, the defendants "dramatically expanded the watch list as a whole and the No Fly List in particular." Third Amend. Compl. ¶ 30.

the inability to fly to a significant extent defines the geographical area in which he may live his life. As a practical matter, an affected person is restricted in his ability to visit family and friends located in relatively distant areas of the country or abroad, which through flight can be reached within a matter of hours but would otherwise take days, if not weeks, to access. *See Latif v. Holder*, No. 3:10-cv-750, 2013 WL 4592515, at *8 (D. Or. Aug. 28, 2013) (noting that flight is often the only feasible form of international travel); *Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, 2012 WL 6652362, at *7 (N.D. Cal. Dec. 20, 2012) (same). An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities. It is difficult to think of many job categories of any substance where an inability to fly would not affect the prospects for employment or advancement; one need only reflect on how an employer would view the desirability of an employee who could not travel by air. An inability to fly likewise affects the possibility of recreational and religious travel, given the time periods usually available to people, particularly those who are employed.[11]

---

[11] The extent to which the No Fly List is "exported" to agencies and entities other than the TSA is not clear from the present record. However, it does appear that such information has a much broader distribution than merely to the TSA, extending to other law enforcement and passenger screening agencies as well as for use in employment screening. *See* Piehota Decl., ¶ 15 ("The TSC, through the TSDB, makes terrorist identity information accessible to various screening agencies and law enforcement entities by the regular export of updated subsets of TSDB data. For example, the No Fly and Selectee Lists are subsets of TSDB information that are available for passenger and employee screening."). The court in *Latif* observed that the TSC shares watchlist information with twenty-two foreign governments and that United States Customs and Boarder Protection makes recommendations to ship captains as to whether a passenger poses a risk to transportation security. *See Latif*, 2013 WL 4592515, at *9. This type of distribution, of course, only compounds the restrictions on travel and other effects placement in the TSDB has on an American citizen.

Inclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing, war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public. In effect, placement on the No Fly List is life defining and life restricting across a broad range of constitutionally protected activities and aspirations; and a No Fly List designation transforms a person into a second class citizen, or worse. The issue, then, is whether and under what circumstances the government should have the ability to impose such a disability on an American citizen, who should make any such decision, according to what process, and by what standard of proof.

The War on Terrorism in which the United States is currently engaged is not the first time the judicial branch has had occasion to consider these national security issues. During the Cold War, with its threat of unbridled nuclear war, the courts considered the constitutionality of laws limiting the issuance of passports in order to restrict the travel of American citizens suspected of subversive, Communist activities that, as reflected in congressional findings,[12] were perceived as raising public safety and national security concerns comparable to those associated with the

---

[12] In support of the Subversive Activities Act of 1950, Congress found that there "exists a world Communist movement . . . whose purpose it is, by treachery, deceit, infiltration, . . . espionage, sabotage, terrorism, and any other means deemed necessary, to establish a communist totalitarian directorship in the countries throughout the world through the medium of a world-wide Communist organization." *Aptheker v. Sec'y of State*, 378 U.S. 500, 508 n.8 (1964). Congress further found that the Communist organization in the United States and the world Communist movement presented a danger to the security of the United States that required legislative action. With respect to the restrictions of Section 6 of the Act, pertaining to the issuance of passports, Congress more specifically found that "[d]ue to the nature and scope of the world Communist movement, with the existence of affiliated constituent elements working toward common objectives in various countries of the world, travel of Communist members, representatives, and agents from country to country facilitates communication and is a prerequisite for the carrying on of activities to further the purposes of the Communist movement." *Id.*

14

threats of terrorism today.  In a series of cases, the federal courts, including the United States

Supreme Court, addressed the constitutional limits on the government's reach over a citizen's

freedom of movement.  For example, in *Kent v. Dulles*, 357 U.S. 116 (1958),[13] the Supreme

Court considered the right to travel and the protections it enjoyed from restrictions in the name of

national security:

> The right to travel is a part of the 'liberty' of which the citizen cannot be deprived
> without the due process of law under the Fifth Amendment . . . .  In Anglo-Saxon law that
> right was emerging at least as early as the Magna Carta.  Chafee, Three Human Rights in
> the Constitution of 1787 (1956), 171-181, 187 *et seq.*, shows how deeply engrained in our
> history this freedom of movement is.  Freedom of movement across frontiers in either
> direction, and inside frontiers as well, was a part of our heritage.  Travel abroad, like
> travel within the country, may be necessary for a livelihood.  It may be as close to the
> heart of the individual as the choice of what he eats, or wears, or reads.  Freedom of
> movement is basic to our scheme of values.  'Our nation,' wrote Chafee, 'has thrived on
> the principle that, outside areas of plainly harmful conduct, every American is left to
> shape his own life as he thinks best, do what he pleases, go where he pleases.'

*Id.* at 125-26 (some citations omitted).  Observing that the government has been allowed in times

of war to exclude citizens from their homes and restrict their freedom of movement only upon a

showing of "the gravest imminent danger to the public safety," the *Kent* Court reaffirmed that:

> [T]he right of exit [from the United States] is a personal right included within the word
> 'liberty' as used in the Fifth Amendment.  If that 'liberty' is to be regulated, it must be
> pursuant to the lawmaking functions of the Congress.  And if that power is delegated, the
> standards must be adequate to pass scrutiny by the accepted tests.  Where activities or
> enjoyment, natural and often necessary to the well-being of an American citizen, such as
> travel, are involved, we will construe narrowly all delegated powers that curtail or dilute
> them.

*Id.* at 128-29 (internal citations omitted).  In summary, the Court emphasized that in dealing with

restrictions on travel, such as those imposed in that case, "[w]e deal with beliefs, with

---

[13] In *Kent*, the Court considered a challenge to regulations promulgated by the Secretary of State
that prohibited the issuance of passports to members of the Communist Party and individuals
engaged in activities in support of the Communist movement.  The Court held that the Secretary
of State lacked the authority to promulgate the regulations and therefore did not reach the
question of whether the regulations would be constitutional if authorized.

associations, with ideological matters.  We must remember that we are dealing with citizens who have neither been accused of crimes nor found guilty." *Id.* at 130.

The Court revisited the constitutionality of statutory restrictions on the right to travel in *Aptheker v. Secretary State,* 378 U.S. 500 (1964).  There, the Court reviewed the constitutionality of Section 6 of the Subversive Activities Control Act of 1950, which made it unlawful for any member of a registered Communist organization with knowledge or notice of the registration to apply for or use a U.S. passport.  The Court recognized that "freedom of travel is a constitutional liberty closely related to rights of speech and association," and in declaring Section 6 unconstitutional, reaffirmed that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id.* at 508, 517 (quoting *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)).  The Court recognized that the application of these principles required it to consider the congressional purpose underlying the restrictions on the right to travel:

> The Government emphasizes that the legislation in question flows, as the statute itself declares, from the congressional desire to protect our national security.  That Congress under the Constitution has power to safeguard our Nation's security is obvious and unarguable.  As we said in [*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159-60 (1963)], 'while the Constitution protects against invasions of individual rights, it is not a suicide pact.'  At the same time the Constitution requires that the powers of government must be so exercised as not, in attaining a permissible end, unduly to infringe a constitutionally protected freedom.

*Id.* at 509 (some internal citations and quotation marks omitted).

The Court in *Aptheker* concluded:

> [Section 6] sweeps too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment.  The prohibition against travel is supported only by a tenuous relationship between the bare fact of organizational membership and the activity Congress sought to proscribe.  The broad and enveloping prohibition indiscriminately

16

> excludes plainly relevant considerations such as the individual's knowledge, activity, commitment, and purposes in and places for travel. The section therefore is patently not a regulation narrowly drawn to prevent the supposed evil, yet here, as elsewhere, precision must be the touchstone of legislation so affecting basic freedoms.

*Id.* at 514 (internal quotation marks and citations omitted).

These passport cases did not deal with the limits on governmental authority within the specific context of airline safety, but rather assessed the extent of that authority based on broader national security justifications more directly associated with rights of association and freedom of speech. Nevertheless, when the basic principles discussed in *Kent* and *Aptheker* are applied to the No Fly List, substantial constitutional issues are immediately apparent.

First, the No Fly List, once distributed, clearly infringes upon a citizen's right to travel; and the Court cannot conclude based on the present record that there are no means less restrictive than an unqualified flight ban to adequately assure flight security, such as comprehensive pre-flight screening and searches. Second, the current record is inadequate to explain why judicial involvement before a person is placed on the No Fly List is either unnecessary or impractical, other than perhaps within the context of an emergency based on a specific, imminent threat that requires immediate action. Nor does the record conclusively establish that there cannot be any opportunity, either before or after an American citizen is placed on the No Fly List, to know of or challenge any of the information used to list him, even where such information could be summarized in a way that does not compromise sources or methods.

Third, substantial issues exist concerning the standards used, or required to be used, to determine whether an American citizen can be banned from flying. The process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct. In that connection, the TSC's currently applied standard for

17

inclusion is "satisfaction of a certain substantive derogatory criteria establishing that the individual may be a known or suspected terrorist." Piehota Decl., ¶ 12.  And "[w]hether the individual satisfies the substantive derogatory criteria is generally based on whether there is reasonable suspicion to believe that a person is a known or suspected terrorist." *Id.*  While determining whether a person is a "known terrorist" appears to be straightforward and based on certain formal actions taken within the criminal justice system,[14] whether a person is a "suspected terrorist" appears to be based to a large extent on subjective judgments.  As the defendants explain, "[a] suspected terrorist is an individual who is *reasonably suspected* to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and *reasonable suspicion*." Piehota Decl., n.5 (emphasis added).  In other words, an American citizen can find himself labeled a suspected terrorist because of a "reasonable suspicion" based on a "reasonable suspicion."

What constitutes conduct sufficiently "related to" or "in aid of" terrorism is not explained, but it is not difficult to imagine completely innocent conduct serving as the starting point for a string of subjective, speculative inferences that result in a person's inclusion on the No Fly List.  For example, is the academic study of terrorism or the investigative reporting of terrorist activities "related to terrorism and terrorist activities"?  Is providing financial support to a charitable organization enough, even without knowledge that some of the organization's activities are "in aid of . . . terrorist activities"?  Is it enough to be a member of a lawfully operating social or religious organization whose membership may include other persons

---

[14] "A known terrorist is an individual who has been convicted of, [or is] currently charged with, or under indictment for a crime related to terrorism in a U.S. or foreign court of competent jurisdiction." Piehota Decl., n.4.

suspected of terrorism?  Is studying Arabic abroad, as Mohamed concedes he did, conduct "in preparation for . . . terrorist activities"?  A showing of past or ongoing unlawful conduct does not seem to be required, and the level of proof required for inclusion on the No Fly List appears to be far less than that required to obtain such law enforcement tools as a search or arrest warrant or a thirty-day wiretap.  *See* U.S. Const. amend. IV; 50 U.S.C. § 1805(a)(2).  But the Court has little, if any, ability to articulate what information is viewed by the TSC as sufficiently "derogatory" beyond the labels it has provided the Court.[15]

In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot legally be arrested, detained, or otherwise restricted in their movements or conduct.  The No Fly List also assumes that in order to achieve its intended purpose, it must be compiled and distributed without any judicial review or involvement and without any opportunity for the citizen to learn of or contest the accuracy of any information used to justify his inclusion on the list.  Specifically at issue in this case is whether, given the substantial liberty interest in freedom of movement possessed by every citizen, the No Fly List, as applied to American citizens, comports with the requirements of substantive and procedural due process.

---

[15] The TSC assures the Court that it does not engage in invidious discrimination "based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  Piehota Decl., ¶ 12.  Those assurances, however, do not rule out the possibility, if not probability, that determinations may be bound up with beliefs, personal associations, or activities that are perceived as threatening but are perfectly lawful in themselves, and may indeed be constitutionally protected.

## B. Plaintiff's Claims and Defendants' Objections

The defendants seek dismissal of Mohamed's claims on both procedural and substantive grounds. First, they argue that Mohamed's claims must be dismissed because he failed to exhaust the available administrative remedies, he lacks standing, and his claims are not ripe for adjudication. Substantively, the defendants contend that: 1) Mohamed has failed to allege a violation of his right to reside in or reenter the United States, and that such a claim is in any event moot; 2) the available administrative remedies satisfy Mohamed's procedural due process rights; and 3) Mohamed's APA claim fails for the same reasons as his other claims and because he makes no allegations supporting a claim of arbitrary and capricious agency action. The Court will address these arguments in turn.

### (1) Exhaustion, Standing, and Ripeness

The defendants seek dismissal of Mohamed's claims on the ground that he has not presented his claims to the TSA through DHS TRIP and has therefore failed to exhaust administrative remedies. The defendants do not contend that the relevant statutes or regulations require exhaustion, but rather that the Court should require Mohamed to utilize DHS TRIP as a matter of prudence because that process could provide him with some of the relief he seeks and because the Court would be in a better position to review Mohamed's claims after the completion of that process. In a related vein, the defendants contend that Mohamed's constitutional claims are too "hypothetical" to satisfy the requirements of standing and ripeness.

"Where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds*. Where exhaustion is not congressionally mandated, on the other hand, "sound judicial discretion" generally governs. *Id.* The Supreme Court has held, however, that a federal court cannot require a plaintiff to exhaust

20

administrative remedies before seeking judicial review of a final agency action under the APA where neither the relevant statute nor an agency rule imposes such a requirement. *Darby v. Cisneros*, 509 U.S. 137 (1993).

For non-APA claims, "federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146. In that regard, requiring administrative exhaustion allows the agency to "correct its own mistakes with respect to programs it administers before it is haled into federal court" and helps to avoid piecemeal appeals. *Id.* at 145-46. Thus, considerations of efficiency and agency expertise may weigh in favor of requiring exhaustion. *See Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir. 1991).

Balancing these conflicting considerations, the Fourth Circuit has recognized that exhaustion should not be required where: (1) exhaustion would be futile; (2) the available administrative remedies would be insufficient; (3) the dispute is a matter of statutory construction; (4) compelling the use of administrative procedures would cause irreparable injury; or (5) requiring exhaustion would leave an administrative decision unreviewed. *See Darby v. Kemp*, 957 F.2d 145, 147 (4th Cir. 1992), *overruled on other grounds*, *Darby v. Cisneros*, 509 U.S. 137 (1993); *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063 (4th Cir. 1991). Because administrative remedies are almost always inadequate to address procedural due process challenges to those remedies, such challenges are particularly immune from administrative exhaustion requirements. *See Bangura v. Hansen*, 434 F.3d 487, 494 (6th Cir. 2006) ("Exhaustion of administrative remedies may not be required in cases of non-frivolous constitutional challenges to an agency's procedures."); *see also Gibson v. Berryhill*, 411 U.S. 564, 575 (1973) (holding that appellee was not required to exhaust state administrative remedies

21

where "the question of the adequacy of the administrative remedy . . . was for all practical purposes identical with the merits of appellees' lawsuit"); *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996) (holding that exhaustion of administrative remedies under the Longshore and Harbor Workers' Compensation Act was not required where the administrative process was inadequate to address the Longshoreman's claim that the Act unconstitutionally deprived him of a hearing prior to the deprivation of benefits).

The Court concludes that it would be inappropriate to require exhaustion in this case. First, as the defendants acknowledge, Congress has not mandated exhaustion of the DHS TRIP process with respect to Mohamed's claims, and there are no regulations regarding DHS TRIP that mandate exhaustion. *See* 49 U.S.C. §§ 44903(j)(2) & 44926(a) (directing DHS to create a redress program without requiring that travelers take advantage of it). It would therefore appear that the Court could not, under the holding in *Darby v. Cisneros*, require Mohamed to exhaust the DHS TRIP process before proceeding with his APA appeal in Count II. To require exhaustion with respect to Mohamed's other claims, then, would essentially bifurcate substantially related, if not common, claims and create, rather than avoid, piecemeal litigation.

Second, it is difficult to see how exhaustion of DHS TRIP would significantly assist the Court in adjudicating or resolving Mohamed's claims. Mohamed would not have access to any information the government used to place him on the No Fly List, and once the government completed the review, he would receive only a letter indicating that the review process was complete. He would not receive any substantive information as to whether he was, or ever had been, on the No Fly List, or the grounds for his potential inclusion on the list. For these reasons, Mohamed would not have any opportunity to respond to the information used by the government to place him on the No Fly List; and it is not even clear whether he would have any meaningful

22

opportunity to submit and have considered information that might negate any "derogatory information" possessed by the government, even without access to the government's reasons for his inclusion on the No Fly List.

Moreover, DHS TRIP would not provide Mohamed with any opportunity to present and have considered his constitutional claims. That process addresses only whether a traveler who has submitted an inquiry is in fact the individual listed in the TSDB, and if so, whether there is sufficient information to support the listing. As a result, at the end of the DHS TRIP process, even were the TSC to voluntarily remove Mohamed from the No Fly List, the alleged underlying constitutional infirmities that allowed his name to be included on the list and distributed to airlines would remain in place, unreviewed and with no assurances that Mohamed would not suffer the same alleged injury in the future.[16] In other words, the administrative process that the defendants want exhausted would not address Mohamed's constitutional claims.

Finally, the Court has no expectation that the DHS TRIP process would create a record more helpful than the one that already exists.[17] According to the government, if Mohamed is on

---

[16] As mentioned above, the letters sent by the TSA at the conclusion of the review process indicate that review is available pursuant to 49 U.S.C. § 46110, which provides for review of TSA orders in the Courts of Appeals. The defendants have represented to the Court that, should Mohamed choose to appeal after completing the DHS TRIP process, they would provide to the Court of Appeals an "administrative record" that the Court could review *in camera*. In reversing this Court's August 2011 Order, however, the Court of Appeals reasoned that it lacked exclusive jurisdiction under 49 U.S.C. § 46110 because "resolving substantive and procedural due process challenges to an individual's inclusion on the No-fly list necessarily requires scrutiny of both the TSC's and the TSA's actions," and the Court would be unable to "directly review the TSC's actions, direct the agency to develop necessary facts or evidence, or compel its compliance with any remedy [the court] might fashion." Slip op. at 5-6. Those same considerations would apply were Mohamed to appeal after completion of the DHS TRIP process, indicating that such an appeal would not provide adequate review of Mohamed's constitutional claims.

[17] In *Shearson v. Holder*, 725 F.3d 588, 593-95 (6th Cir. 2013), relied upon heavily by the defendants, the Sixth Circuit held that the plaintiff, who alleged she was detained at the United

the No Fly List, there already exists for the Court's review an administrative file containing the

"derogatory information" the TSC relied upon in placing him on the list. *See* Piehota Decl., ¶ 9.

There is also no reason to think that the DHS TRIP process would develop any of the additional

factual record relevant for the purposes of Mohamed's constitutional claims, given the limited

scope of the issues addressed in DHS TRIP.[18]

As for standing, Mohamed's alleged constitutional injuries constitute an "injury in fact"

that is actual, concrete and particularized, and traceable to the defendants, who are alleged to be

responsible for placing him on the No Fly List and distributing it to the TSA.[19] Further, the relief

Mohamed seeks, including removal from the No Fly List, would redress his alleged injury.[20] As

---

States boarder due to her inclusion in the TSDB, could not pursue her procedural due process claim before seeking relief through DHS TRIP. The court in *Shearson* reasoned that it was appropriate to require exhaustion because the plaintiff might be removed from the TSDB and because the review process would "create a record that may be reviewed by a judge *in camera*." *Id.* at 595. Based on the particular facts and circumstances of this case, the Court finds that neither possibility justifies requiring exhaustion in this case.

[18] Also militating against exhaustion in this case is Mohamed's interest in a prompt adjudication of his claims, first filed more than two years ago, and the lack of any time requirement for the government to complete the DHS TRIP process, coupled with the defendants' inability to provide to the Court any actual estimate of how long that process would take. *See Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 586-87 (1989) (holding that available administrative remedy was inadequate, and therefore declining to require exhaustion, where administrative agency was not required to render a decision within a reasonable time limit).

[19] To establish standing, a plaintiff must show that: (1) he has suffered an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly ... trace[able] to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

[20] The defendants contend that Mohamed lacks standing because he "cannot be allowed to invoke the jurisdiction of this Court by refusing to avail himself of an existing administrative process that may address his alleged harm." Defendants' Memorandum in Support of Motion to Dismiss Plaintiff's Third Amended Complaint (hereinafter "Memorandum in Support") at 13.

to ripeness, there is nothing "hypothetical" about Mohamed's claims, which attack the constitutionality of the No Fly List.[21]  The DHS TRIP process is already established, and Mohamed's participation in the process would not provide the Court with more information about how the process works than the Court already possesses or could be presented at trial.  In the end, the defendants' standing and ripeness challenges are bound up with their exhaustion position and fail for essentially the same reasons.  Thus, the Court concludes that Mohamed has standing and his claims are ripe.

### (2) <u>Defendants' Contention that Plaintiff Fails to State a Claim</u>

#### a. <u>Count I: Citizen's Right to Reenter the United States</u>

In Count I, styled "Violation of U.S. Citizen's Right to Reside in United States and to Reenter the United States from Abroad," Mohamed alleges that, "[b]y placing [him] on the No Fly List while he was abroad, Defendants Unknown TSC Agents prevented [him] from boarding an aircraft to return to the United States, even though no other means existed by which he may return to the United States, thus violating [his] constitutional rights."  Third Amend. Compl. ¶

---

But the cases the defendants cite in support of this position are inapposite, and simply restrict plaintiffs who have failed to take advantage of an available process that "appears to provide due process" from "us[ing]" the federal courts as a means to get back what [they] want."  *Wilson v. MVM, Inc.*, 475 F.3d 166, 176 (3d Cir. 2007) (internal quotation marks omitted).  Here, Mohamed does not seek to bypass ostensibly adequate procedural remedies; rather, he challenges the constitutionality of those remedies, which, by the defendants' own description, do not allow him to raise and have considered his constitutional challenges.

[21] The "basic rationale" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  The court assesses ripeness by "balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration."  *Id.* (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).  The defendants argue that, without requiring Mohamed to submit to the DHS TRIP process, "the Court would be ruling on the hypothetical deficiencies of a process that the Plaintiff has not tested and would be without the benefit of the agency's expert assessment."  Memorandum in Support at 13.

56. Further, Mohamed alleges that, by maintaining him on the No Fly List, the defendants have "substantially burdened his fundamental right to return to the United States in the immediate future." *Id.* ¶ 57. Count I is, in essence, a substantive due process claim.

Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). Those protected rights and interests include those that "are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21 (internal quotation marks and citations omitted). In contrast to the procedural component of the Due Process Clause, substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotation marks omitted).

The defendants do not contest that a United States citizen has a right to reenter the United States. They contend, however, that Count I must fail because the right of reentry attaches only once a citizen presents himself at a U.S. port of entry and does not extend to restrictions that may prevent or impede his ability to reach a U.S. port of entry. Based on this position, the defendants contend that, as a matter of law, based on his allegations, Mohamed has never been denied reentry to the United States, and that, even if he is on the No Fly List, Mohamed will not in the future be denied reentry once he presents himself at the border.

The Court concludes that a U.S. citizen's right to reenter the United States entails more than simply the right to step over the border after having arrived there. *See, e.g.*, *Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) (noting that citizens "have the right to *return* to this country at any time of their liking" (emphasis added)). At some point, governmental actions taken to

26

prevent or impede a citizen from reaching the boarder infringe upon the citizen's right to reenter the United States. The issue is whether the defendants' conduct has in the past or will in the future cross over into an unconstitutional burden on that right of reentry.

Mohamed invokes his right of reentry with respect to both his initial unsuccessful attempt to return to the United States from Kuwait in January 2011 and also with respect to his plans to travel abroad for religious purposes and to visit his family. As to his claim of past constitutional injury, the Court concludes that Mohamed has failed to allege facts that make plausible his claim that his constitutional right of reentry was violated when he was prevented from boarding a plane from Kuwait to the United States on January 16, 2011 because of his placement on the No Fly List. Mohamed's own allegations establish that, although he was denied boarding on that flight, he was able to board a flight on January 20, 2011 and reenter the United States without incident on January 21, 2011. Even accepting as true Mohamed's allegations—including that the government improperly placed him on the No Fly List and prevented him from boarding the January 16th flight—the four to five-day delay that Mohamed experienced in his ability to reenter the United States did not unduly burden his right of reentry and therefore, as a matter of law, did not constitute a constitutional deprivation.

Broader, however, are Mohamed's allegations of present and future harms arising from his inability to fly. In that regard, Mohamed alleges that, even though the defendants permitted his return in January 2011, his continued inclusion on the No Fly List presumptively prevents him from departing the United States to travel abroad for a religious pilgrimage and to visit family members, and, were he able to leave the United States, from returning to the country through any practical means. Thus, Mohamed complains of a violation of his right to exit and return based on the burden placed on his right to international travel, which, as discussed above,

is "an important aspect of the citizen's 'liberty' guaranteed in the Due Process Clause of the Fifth

Amendment." *Aptheker*, 378 U.S. at 505 (quoting *Kent*, 357 U.S. at 127). It is true that the right

to international travel is not, like the right to interstate travel, "virtually unqualified," but rather is

subject to "reasonable governmental regulation." *Haig v. Agee*, 453 U.S. 280, 306-307 (1981)

(citation omitted). Nonetheless, "a governmental purpose to control or prevent activities

constitutionally subject to state regulation may not be achieved by means which sweep

unnecessarily broadly and thereby invade the area of protected freedoms." *Aptheker*, 378 U.S. at

508 (quoting *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)). Whether Mohamed's alleged

disabilities as a result of his alleged inclusion on the No Fly List unconstitutionally burden the

exercise of his right of exit and reentry cannot be decided at this stage as a matter of law.

However, Mohamed's factual allegations, taken as true, suffice to make plausible his substantive

due process claim.

        **b.  Count III:  Procedural Due Process**

      In Count III, Mohamed alleges that the defendants have failed to provide him with "a

meaningful opportunity to challenge his inclusion on the No Fly List either prior or subsequent

to his placement, depriving him of his liberty interest in (1) being able to return to the United

States, (2) traveling by air like other American citizens, and (3) being free from false

governmental stigmatization as a terrorist." Third Amend. Compl. ¶ 62. The defendants contend

that "the redress process available through DHS TRIP is constitutionally sufficient to address

Plaintiff's claims, given the limited private interest at issue, the profound government interest in

protecting the security of civil aviation, and the negligible value of additional measures given the

robust internal review of highly sensitive information by experts tasked with protecting national

28

security." Defendants' Memorandum in Support of Motion to Dismiss Plaintiff's Third

Amended Complaint at 16.

"The fundamental requirement of due process is the opportunity to be heard at a

meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)

(internal quotation marks omitted). However, "[t]he procedural protections required by the Due

Process Clause must be determined with reference to the rights and interests at stake in the

particular case." *Washington v. Harper*, 494 U.S. 210, 229 (1990). In evaluating the sufficiency

of the process the government has provided in a particular case, the Court must consider: (1) "the

private interest that will be affected by the official action"; (2) "the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards"; and (3) "the Government's interest." *Mathews*,

424 U.S. at 335. These factors, when considered within the context of Mohamed's allegations,

necessarily require an evidentiary record beyond that presented to the Court in connection with

the defendants' motion to dismiss.

As discussed above, Mohamed alleges a range of protectable interests, including his right

to travel, that have been affected adversely by his alleged inclusion on the No Fly List.[22]

---

[22] Central to the defendants' defense of the No Fly List is their contention that there is no fundamental right to the most convenient form of travel. *See* Memorandum in Support at 18-19 (citing, *e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1136-37 (9th Cir. 2006) (holding that airline policy requiring identification to fly did not unreasonably burden right to interstate travel); *Miller v. Reed*, 176 F.3d 1202, 1205-1206 (9th Cir. 1999) (indicating that there is no fundamental right to drive); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification."). As discussed above, the constitutional issues presented by the No Fly List, as it applies to American citizens, go far beyond any claimed right to travel by the most convenient means. In any event, in none of the cases the defendants cite was the plaintiff deprived entirely of the right to travel by air. *See Gilmore*, 435 F.3d at 1137 (challenge to identification policy requiring airline passengers to

29

Further, the government's interest in combating terrorism is no doubt substantial. The Court must then determine whether the No Fly List and the redress procedures provided through DHS TRIP constitute appropriate means to prevent terrorism directed against air travel while protecting the liberty interests at stake. By the defendants' own account, individuals are placed in the TSDB according to a reasonable suspicion standard and without any judicial involvement. Nominations to the No Fly List must satisfy "additional derogatory requirements," Piehota Decl., ¶ 10, but it is unclear what these are. Regardless, it does not appear that unlawful conduct, unlawful speech, or unlawful association is required.

As the defendants have also acknowledged, an individual placed on the No Fly List does not receive any notice of his placement on the list, pre-deprivation or otherwise, or the reasons for his inclusion. Further, an individual's inclusion on the No Fly List and the dissemination of that list are accomplished without any judicial involvement or review, and according to a standard of proof that is far less than that typically required when the deprivation of significant constitutional liberties are implicated. While the government no doubt has a significant and even compelling interest, an American citizen placed on the No Fly List has countervailing liberty interests and is entitled to a meaningful opportunity to challenge that placement. And, while judicial review of some sort is available pursuant to 49 U.S.C. § 46110, as discussed above, it is not at all clear that such review will effectively address the constitutional issues presented by a citizen's inclusion on the No Fly List. Finally, the defendants have not made a sufficient

present identification or be subjected to more extensive searches); *Cramer*, 931 F.2d at 1029-33 (challenge to law that restricted interstate air service from a particular airport); *City of Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982) (challenge to regulations prohibiting air carriers from operating nonstop flights between Washington National Airport and any airport more than 1,000 miles away).

showing at this point that they could not accomplish their objectives using less restrictive means, such as enhanced screening.

For these reasons, the Court cannot conclude, as a matter of law, that DHS TRIP provides sufficient process to defeat Mohamed's procedural due process claim, and instead must conclude that Mohamed has alleged facts sufficient to make that claim plausible. In resolving the claim, the Court must engage in a fact-intensive consideration of the personal liberties involved, the government's compelling interest in combating terrorism, the procedures used in connection with the No Fly List, and the use made of the No Fly List.

### c. Count II:  Administrative Procedure Act

In Count II of his Third Amended Complaint, in addition to reiterating his constitutional claims, Mohamed alleges that "Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional right and should be set aside as unlawful pursuant to 5 U.S.C. § 706." Third Amend. Compl. ¶ 59. The issues presented in Mohamed's APA claim essentially conflate with his constitutional claims. Thus, for the same reasons discussed above the Court concludes that Mohamed's factual allegations make plausible his claim that the defendants' actions were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

### III. CONCLUSION

For the reasons stated above, the defendants' Motion to Dismiss will be GRANTED in part and DENIED in part. The Motion will be granted as to Plaintiff's claim in Count I of his Third Amended Complaint that he was denied his constitutional right of reentry in January 2011, and will otherwise be DENIED.

An appropriate Order will issue.

31

/s/

Anthony J. Trenga
United States District Judge

**Alexandria, Virginia**
**January 22, 2014**

32